UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RICARDO PALOMO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:13-cv-01544-TWP-MJD |
| | ) | |
| CAROLYN W. COLVIN Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Ricardo Palomo requests judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying his application

for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security

Act ("the Act"). *See* 42 U.S.C. §§ 416(i), 423(d). For the reasons set forth below, the Magistrate

Judge recommends that the decision of the Commissioner be **AFFIRMED**.

## Procedural History

Palomo filed an application for DIB on June 24, 2010, alleging an onset of disability on

August 22, 2009. Palomo's application was denied initially on November 19, 2010 and on

reconsideration on December 2, 2010. Palomo requested a hearing, which initially occurred on

October 3, 2011. At that hearing, Palomo explained that he did not have counsel present, and

Administrative Law Judge ("ALJ") William Manico postponed the hearing. On January 11,

2012, ALJ Manico conducted a hearing via video conference, at which Plaintiff was represented

by attorney Scott Lewis. The ALJ concluded Plaintiff was not disabled at any time from his

alleged onset date through the date of the ALJ's May 4, 2012 decision. The Appeals Council

denied Palomo's request for review on July 26, 2013, rendering the ALJ's decision final. Palomo filed his complaint with this Court on September 25, 2013. Although Plaintiff was represented by counsel at his hearing, he is pro se before this Court.[1]

**Factual Background and Medical History**

Plaintiff Ricardo Palomo served in the U.S. Army from February 1983 to August 1994. [R. at 317.] After his discharge, he worked as an associate stock broker from October 1995 to December 2001, [R. at 253], and as a customer service representative in the insurance industry from March 2003 to March 2004. [*Id.*] In 2005, he applied for DIB, but the appeals council denied his application in 2006. [R. at 249.] Plaintiff then filed a second claim for DIB, but this claim was denied at the hearing level in August 2009. [*Id.*]

Plaintiff's current application for DIB was filed in June 2010 and alleges an onset of disability on August 22, 2009. [R. at 215.] After the alleged date of onset, Plaintiff worked part-time as a high school softball coach. [R. at 237, 252, 317.] He also worked "when needed" as a substitute teacher from March 2009 to May 2011. [R. at 317.]

Plaintiff's application alleges disability due to a severe back injury, chronic depression, arthritis, anxiety, lack of concentration, mental incoherence, and hearing loss. [R at 252.]

**A. Mental Condition and Symptoms**

Plaintiff's history of depression began in 1986 with the stillborn birth of his daughter and worsened after a 1990 training accident in which he sustained lingering injuries. [R. at 414.] In 2007, Plaintiff underwent a mental exam at the Indianapolis Veterans Affairs Medical Center ("VAMC"). [R. at 410.] The examiner diagnosed depression and noted symptoms such as

---

[1] Despite being unrepresented, Plaintiff must still "present arguments supported by legal authority and citations to the record." *Cadenhead v. Astrue*, 410 F. App'x 982, 984 (7th Cir. 2011); *see also McLachlan v. Astrue*, 392 F. App'x 493, 494 (7th Cir. 2010) (dismissing pro se brief that lacked developed arguments).

irritability, sleep disturbances, poor concentration, and feelings of hopelessness. [R. at 421.] She

assigned a Global Assessment of Functioning ("GAF") score of 40, indicating potentially major

impairments in areas such as work or school, [R. at 28, 421], and opined that Plaintiff's

"depressive symptoms are severely impairing his work functioning." [R. at 424.] The examiner,

however, also noted that external factors, such as "financial stressors" and "marital stressors,"

could be exacerbating Plaintiff's depression, and that Plaintiff symptoms "fluctuate to some

degree." [R. at 421.] She also stated that Plaintiff's "lack of interest" in employment could be

affecting his ability to find a job. [R. at 420.]

On May 30, 2007, Dr. Jerome Modlik performed a psychological consultative exam. [R.

at 336.] He observed "no abnormalities of speech, thought or gesture." [R. at 338.] Cognitively,

Plaintiff was "oriented in all spheres" and his performance on a WMS-III IQ test was "squarely

in the average range." [R. at 338-39.] Emotionally, Plaintiff reported that he was depressed, sad,

and withdrawn, and said he had "problems with temper control." [R. at 339.] Dr. Modlik found

Plaintiff's affect "was perhaps mildly restricted" and was "rather neutral." [R. at 340.] He also

noted that financial concerns contributed to Plaintiff's emotional difficulties. [R. at 339.]

Dr. Modlik's overall impression was "that [Plaintiff] does not appear to have any

significant psychiatric or mental health problems that prevent him from working." [R. at 340.]

He assigned a GAF score of 65, indicating mild limitations in social and occupational

functioning. [R. at 26, 341.]

In July 2008, Plaintiff underwent another mental examination at the VAMC. [R. at 380.]

The examiner reported that Plaintiff was on anti-depressants with "fair" effectiveness. [R. at

383.] Plaintiff said the medicine "helped," but he was "irritable" and could "blow[] up" at times.

[*Id.*] Plaintiff also reported feeling "worthless" and "depressed," primarily because he could not

"get gainful employment" and had a stressful family situation. [R. at 383-84.] He complained of

"concentration problems" and said he "can't remember simple things," [R. at 384], and he

explained that these symptoms "have increased as his financial stressors have increased." [*Id.*]

The examiner found that Plaintiff's speech was clear and coherent; his attitude was

"cooperative;" his affect was "constricted;" and his mood was "depressed." [R. at 385.] She

assigned a GAF of 40, indicating potentially major impairments, [R. at 391], but reported that

Plaintiff had "no" problems with activities of daily living. [R. at 388.] She also found Plaintiff

had "average" intelligence, concluded his memory was "mildly impaired," and suggested

Plaintiff's "lack of motivation" impaired his ability to find employment. [R. at 386, 389-90.]

Plaintiff returned to the VAMC in February 2010. [R. at 429.] He reported depression

and difficulty concentrating, and the examining doctor determined his depression was "severe."

[R. at 433-34.] Plaintiff, however, also stated that his "depression [was] stable" and suggested he

"would have a better outlook if he was out of the house more." [R. at 433.] The physician

increased the dosage of Plaintiff's anti-depressant medications. [R. at 436.]

Plaintiff underwent another mental consultative exam in August 2010, this time with Dr.

Bonnie Pisano. [R. at 571.] Plaintiff reported "increasing depression and anxiety," [R. at 572],

and Dr. Pisano found that Plaintiff's "attention and concentration varied" and were "unreliable."

[R. at 572-73.] Nonetheless, she wrote that Plaintiff's "Short-term/Working memory is intact,"

[R. at 573], and said Plaintiff had "good cognitive skills even in the presence of considerable

anxiety and depression." [R. at 574.] Dr. Pisano found that Plaintiff could attend to some

activities of daily living and enjoyed his part-time work as a coach, but noted that he refused to

go shopping with his wife because of fears that he could not control his temper. [R. at 574.] She

determined that Plaintiff was "dependent on his wife for some but not all aspects of functioning,"

and found that Plaintiff had "problems with interpersonal interaction that could cause team work problems." [R. at 574.] Overall, Dr. Pisano assigned a GAF score of 33, indicating potentially major impairments in social or occupational functioning. [*Id.*] She also noted that financial strain and family conflict could impact Plaintiff's functioning. [*Id.*]

Dr. J. Gange completed a psychiatric review technique form in September 2010. [R. at 584.] He found Plaintiff had "mild" limitations in activities of daily living; "mild" limitations in social functioning; "mild" limitations in maintaining concentration, persistence or pace; and no episodes of decompensation. [R. at 594.] He accordingly concluded that Plaintiff's mental impairments were not severe. [R. at 584.]

Dr. Gange found Dr. Pisano's conclusions inconsistent with other evidence in the record. [R. at 596.] Plaintiff, for instance, had informed Dr. Pisano that he refused to go shopping, but Plaintiff's wife reported that Plaintiff would in fact go to the store with her. [*Id.*] Dr. Gange also noted that Plaintiff drove his wife to and from work and would sometimes go shopping on his own. [*Id.*] He thus concluded that Dr. Pisano's description of major mental limitations was inconsistent with Plaintiff's activities of daily living. [*Id.*]

Plaintiff returned to the VAMC in September 2010. [R. at 610.] He said he was seeking mental treatment because "[o]ngoing financial issues," such as foreclosure on his home, had "triggered and intensified his mood." [R. at 612.] He presented with irritation and depression, and said he had stopped taking anti-depressant medications for the past six to seven months because he disliked the medications' side effects. [R. at 610, 612.]

The VA referred Plaintiff for a psychiatric assessment, and Plaintiff explained at the ensuring appointment that his financial and family difficulties had "intensified." [R. at 620.] He said he was ten payments behind on his house and had lost his truck "due to being unable to have

it refinanced." [*Id.*] The VA examiner noted that Plaintiff exhibited anxiety and "appear[ed] to have difficulty with short and long-term memory." [R. at 628-29.] Plaintiff reported that his anxiety was "attributed to mainly financial concerns," and the examiner noted that Plaintiff was "[t]alking nonstop re: financial concerns." [R. at 630.] The examiner also observed that the "[f]acts are continuously changing regarding employment/education/financial issues/partner issues," and that despite Plaintiff's financial concerns, he was "spending $7000 to send his daughter to a private university for the fall semester." [*Id.*] Plaintiff acknowledged that medication improved his mood. [*Id.*] He reiterated that he had stopped taking some of his previous medications because of undesirable side effects, but he "refuse[d] to provide a reason for discontinuing" other medications. [*Id.*]

Overall, the examiner assigned a GAF of 55, indicating moderate social and occupational limitations. [R. at 30, 631.] The examiner also reported that Plaintiff spent an "excessive" amount of time discussing his finances, [R. at 630], and recommended a treatment plan focusing on helping Plaintiff "with handling financial issues." [R. at 631.]

Plaintiff returned for individual therapy in October 2010. [R. at 667.] He again reported financial difficulties, including foreclosure on his home and "paying the full cost of tuition" for his daughter at Depauw University. [R. at 667.]  He complained of anger issues and indicated he was unwilling to explore group therapy options. [*Id.*] The therapist made plans to continue addressing Plaintiff's "mood issues" and discussed vocational rehabilitation. [*Id.*]

In November 2010, Dr. Joseph Pressner reviewed Dr. Gange's opinion that Plaintiff's mental impairments were not severe. [R. at 697.] Dr. Pressner noted that Plaintiff's September and October 2010 VAMC appointments could indicate that his status had deteriorated in the time since Dr. Gange issued his opinion, [R. at 699], but Dr. Pressner sought and received additional

information about Plaintiff's activities of daily living to assess whether this was the case. [R. at 702-03.] Ultimately, Dr. Pressner affirmed Dr. Gange's opinion that Plaintiff's mental impairments were not severe. [R. at 697.]

**A.  Physical Condition and Symptoms**

Plaintiff's physical problems began in 1990 with a skiing accident in which Plaintiff broke his back and injured his thumb. [*See* R. at 25.] VAMC records in the years following the accident indicate that he was diagnosed with lower back pain, displaced vertebrae, spinal stenosis, forearm pain, and osteoarthritis. [R. at 344-45, 355, 358, 364, 370.] Claimant qualified as disabled under the VA's standards, [R. at 572, 574], but as noted above, his first two applications for DIB were denied. [R. at 572.]

In 2008, Plaintiff underwent a VAMC compensation and pension benefit examination. [R. at 393.] Dr. Shayne Small reported that Plaintiff had a history of decreased range of motion, stiffness, and weakness in his spine. [R. at 396.] An MRI showed degenerative disc disease and disc protrusion. [R. at 408.]The doctor recommended use of a cane and observed that Plaintiff was only able to "walk ¼ mile." [*Id.*]

In February 2009, Plaintiff underwent a physical therapy consultation at the VAMC. [R. at 492.] The therapist noted "gross cervical spine limitations" that impaired Plaintiff's range of motion. [R. at 494.] The therapist recommended physical therapy, [*id.*], and when Plaintiff returned to the VAMC in September 2009, his back pain remained "clinically stable." [R. at 468.]

During this period, Plaintiff also complained of pain and weakness in his extremities. [*See, e.g.*, R. at 443.] He was referred to the VA neurology department for additional testing to

address the condition, [*see* R. 491], but Plaintiff's later records continued to include reports of pain and weakness in Plaintiff's arms. [*See, e.g.*, R. at 468.]

Plaintiff underwent a physical consultative examination with Dr. Shiva Gollan in August 2010. [R. at 567-68.] Dr. Gollan reviewed the history of Plaintiff's 1990 accident and associated back and thumb injuries, and noted that he had "trouble lifting things" because of the lingering effects of his injuries. [R. at 567.] Plaintiff reported that he had had to use a cane to walk and could do so for only a few feet at a time. [*Id.*] During the exam, Plaintiff walked slowly, but he was able to do so without his cane. [R. at 568.] Dr. Gollan also observed that Plaintiff's range of motion was normal, except that his lumbar spine was 50% limited in forward flexion and 20% limited in extension. [R. at 568-69.] Dr. Gollan rated Plaintiff's motor power as 5/5 in the lower extremity and left upper extremity, but only 4/5 in the right upper extremity. [R. at 568.] The doctor also observed weakness and lack of grip strength because of Plaintiff's thumb injury. [*Id.*]

Dr. J. Sands reviewed Plaintiff's records and provided an RFC assessment in August 2010. [R. at 577.] He determined Plaintiff could occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than ten pounds; stand and/or walk for a total of at least two hours per day; and sit for a total of "about" six hours per day. [R. at 576.] He noted that Plaintiff had limited fine manipulation skills due to his thumb injury and indicated Plaintiff should avoid uneven or wet surfaces to accommodate his difficulty walking. [R. at 579-80.] On review, Dr. M. Ruiz affirmed Dr. Sands' assessment. [R. at 649.]

At the hearing before the ALJ, Plaintiff testified about the physical demands of his former employment as an associate broker and customer service representative. [R. at 109-11.] He stated that they were "desk jobs" that required only limited lifting and never required kneeling, crawling, climbing, or similar activities. [R. at 110.]

**Applicable Standard**

To be eligible for SSI or DIB, a claimant must have a disability under 42 U.S.C. § 423.[2] Disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors. 20 C.F.R. § 404.1520(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities), he is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. § 404.1520(g).

---

[2] In general, the legal standards applied in the determination of disability are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* This court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). To be affirmed, the ALJ must articulate her analysis of the evidence in her decision; while she "is not required to address every piece of evidence or testimony," she must "provide some glimpse into her reasoning . . . [and] build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1176. The Court, that is, "must be able to trace the ALJ's path of reasoning" from the evidence to her conclusion. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000), *as amended* (Dec. 13, 2000).

## The ALJ's Decision

The ALJ first determined that Paolo met the insured status requirements of the Social Security Act through September 30, 2013. [R. at 22.] Applying the five-step analysis, the ALJ found at step one that Palomo had not engaged in substantial gainful activity since August 22, 2009, the alleged onset date. [*Id.*] At step two, the ALJ found Palomo suffered from the following "severe" impairments: "Residual effects of broken arm and leg." [*Id.*][3] The ALJ also considered Palomo's "alleged severe back injury, chronic depression, arthritis, anxiety, lack of

---

[3] As discussed further below, this is a factual error in the ALJ's opinion: Plaintiff never alleged that he suffered from a broken arm or leg. [*See* Dkt. 26 at 1.]

concentration, mental incoherence, hearing loss, and chronic back nerve injury," but determined these impairments were not severe. [R. at 22-24.]

At step three, the ALJ concluded that Palomo did not have an impairment or combination of impairments that meets or medically equals one of the entries in the Listing of Impairments. [R. at 24.] After step three but before step four, the ALJ found that Palomo had the residual functional capacity to perform sedentary work, except:

> claimant may only occasionally balance and stoop, and should never kneel, crouch or crawl. Stooping is limited to a 90-degree angle. He can never climb ladders, ropes, or scaffolds, and may only climb stairs occasionally. He should avoid concentrated exposure to hazards such as hazardous heights and hazardous moving machinery. He should not perform jobs that require him to lock out his left upper extremity, and continuous walking is limited to 5 minutes.

[*Id.*] At step four, the ALJ determined that Palomo was able to perform his past relevant work as an associate broker and customer service representative. [R. at 32.] The ALJ therefore concluded Palomo was not disabled. [*Id.*]

## Discussion

Plaintiff presents four arguments for remand of the Commissioner's decision. He first contends that the ALJ's step four conclusion that he could perform his past relevant work was not consistent with the ALJ's determination of his RFC. [Dkt. 23 at 2.] He then argues that the ALJ "did not understand treatment for mental health;" that the ALJ "made procedural errors" and was "not reviewing the record for Ricardo Palomo when he render[ed] his decision;" and that the ALJ's decision was not supported by substantial evidence because certain documents had been omitted from Plaintiff's file. [*Id.* at 2-3.]

### A.  The ALJ's Step Four Conclusion

The ALJ determined at step four that Plaintiff could perform his past work as an associate broker and customer service representative. [R. at 32.] Plaintiff contends this conclusion does not

comport with the ALJ's RFC analysis because 1) "there was no evidence that either job required walking only five minutes;" 2) the ALJ "erroneously evaluated the sitting demands of both past relevant jobs;" 3) "there was no evidence that either job did not require locking out the left upper extremity;" and 4) "there was no evidence that a mild concentration deficit would not impede the semi-skilled past relevant jobs at issue." [Dkt. 23 at 2.]

### 1. Walking Limitations

As noted above, the ALJ's RFC determination included a limitation that Plaintiff should not continuously walk for more than five minutes at a time. [R. at 24.] Plaintiff contends that there "was no evidence that [Plaintiff's] past relevant work as an associate broker or as a customer service representative involved walking for only five minutes at a time," such that it was erroneous for the ALJ to conclude that Plaintiff could perform his past work with the walking limitation. [Dkt. 23 at 5.]

Plaintiff's argument improperly attempts to shift the evidentiary burden of the sequential disability analysis. At steps one through four of this analysis, "*[t]he claimant* bears the burden" of proof. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (emphasis added). Only if the claimant reaches step five does the burden shift to the Commissioner. *Id.* Thus, the claimant bears the burden at step four of establishing that his "residual functional capacity leaves him unable to perform his past relevant work." *See id*.

Plaintiff in this case has not cited any evidence indicating that his past relevant work as a broker or customer service representative required him to walk more than five minutes at a time. [*See* Dkt. 23 at 15.] He correctly notes that the ALJ did not specifically ask him how long he had to continuously walk while working in these jobs, [*see* R. at 109-11], but Plaintiff himself testified that the jobs were "desk jobs," [R. at 109], and he does not offer any evidence that the

five-minute limitation contained in the ALJ's RFC would preclude working in these jobs. Plaintiff therefore has not satisfied his burden to show that he was unable to perform his past relevant work.

Moreover, the Court in this case can easily "trace the ALJ's path of reasoning." *Clifford*, 227 F.3d at 874 (7th Cir. 2000). Plaintiff's own descriptions of the associate broker and customer service positions stated that they involved walking "15-20" minutes per day. [R. at 261, 263.] The ALJ cited these reports, [R. at 32], and reasonably could have concluded that Plaintiff could have distributed this time spent walking in five-minute increments spaced throughout the day. Indeed, this Court must "give [the ALJ's opinion] a commonsensical reading," rather than "nitpick[ing]" it "for inconsistencies or contradictions." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Here, commonsense dictates that Plaintiff could walk 15 to 20 minutes each day without walking more than five minutes at a time, such that substantial evidence supports the ALJ's conclusion that Plaintiff could perform the walking necessary in his past employment.

### 2. Sitting Demands

Plaintiff's description of the broker and customer service positions indicate that they involved sitting six and one half hours per day. [R. at 261, 263.] Plaintiff then contends that the ALJ found that he could sit for only six hours per day, thereby precluding him from performing this past relevant work. [Dkt. 23 at 5-6.]

Plaintiff's argument rests on a misapprehension of the ALJ's RFC analysis. As Plaintiff notes, the ALJ found that Plaintiff "could perform 'sedentary' work," [Dkt. 23 at 6 (citing R. at 24).] Such a finding, however, does not imply that Plaintiff could sit for *no more* than six hours per day. Rather, "[s]edentary work implies a capacity to sit for *at least* six hours in an eight-hour work day." *Kirby v. Heckler*, 587 F. Supp. 447, 450 (N.D. Ill. 1984) (citation omitted) (emphasis

added); *see also Sanchez v. Colvin*, No. 13-CV-519-BBC, 2014 WL 3667077, at *6 (W.D. Wis. July 22, 2014) ("sedentary jobs would require" ability to "sit for at least six hours"); *Gaspari v. Astrue*, No. 10 C 6759, 2011 WL 5980994, at *9 (N.D. Ill. Nov. 23, 2011) (upholding ALJ's determination where "residual functional capacity to perform sedentary work" implied Plaintiff "could sit at least 6 hours"). Thus, in concluding that Plaintiff in this case could "perform sedentary work," the ALJ did not limit Plaintiff to sitting *only* six hours per day, and thus did not preclude Plaintiff from sitting for the six and one half hours necessary to perform his past work.

In addition, focusing on the alleged half-hour discrepancy between the RFC analysis and the definition of sedentary work would constitute the sort of "nitpicking" of the ALJ's opinion that the Seventh Circuit has often criticized. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The SSA itself recognizes that for "sedentary" work, "sitting should *generally* total *approximately* 6 hours of an 8-hour workday." SSR 83-10 (emphasis added). Given these qualifiers, a finding that a claimant can perform sedentary work does not limit that person to sitting for exactly six hours. Hence, the ALJ's conclusion in this case that Plaintiff could perform "sedentary work" easily could have encompassed a conclusion that Plaintiff could sit for six and one half hours per day. Substantial evidence therefore supports the ALJ's determination that Plaintiff was able to meet the sitting requirements of his past work.

### 3. Locking Out the Left Upper Extremity

Plaintiff next notes that the ALJ restricted Plaintiff from performing jobs that "require him to lock out his left upper extremity," and asserts that there was "no evidence that either [job as an associate broker or customer service representative] did not require locking out the left upper extremity." [Dkt. 23 at 15.]

Again, Plaintiff improperly attempts to shift the burden at step four to the Commissioner. At step four, the burden is on Plaintiff to demonstrate that his "residual functional capacity leaves him unable to perform his past relevant work." *See Briscoe ex rel. Taylor*, 425 F.3d at 352. Plaintiff in this case cites no evidence indicating that either of his past relevant jobs required him to lock out his left upper extremity. [*See* Dkt. 23 at 15.] Further, Plaintiff's descriptions of his past occupations contained no indication that either job required locking out his left arm. [*See* R. at 261, 263.] In fact, Plaintiff described the amount of "reaching" involved in both job as "none," [*see id.*], and testified before the ALJ that neither job involved extensive lifting. [*See* R. at 110.] The ALJ considered this evidence and testimony, [R. at 32], and thus reasonably concluded that Plaintiff would be able to perform his past jobs without locking out his left arm. Hence, the ALJ's decision need not be remanded on this basis.

### 4. Effect of Mild Concentration Deficit

Plaintiff finally contends that the ALJ's step four analysis was faulty because he did not account for Plaintiff's mental impairments in the RFC analysis. [Dkt. 23 at 6-7.] Plaintiff notes that the ALJ determined at step two that Plaintiff had "mild" difficulties in concentration, persistence, or pace, [*see* R. at 23], but did not include any mental limitations in his statement of Plaintiff's RFC. [R. at 24.] He therefore argues that the ALJ erred by failing to consider his non-severe mental impairments in his RFC assessment. [Dkt. 23 at 7.]

Plaintiff is correct the ALJ found at step two that Plaintiff had "mild" limitations in concentration, persistence, or pace. [R. at 23.] The ALJ, however, also noted that the mental limitations discussed during step two are "not a residual functional capacity assessment," and are instead used only "to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process." [*Id.*] This statement accords with the SSA's guidance on evaluation of

mental impairments, which provides that "limitations identified [in step two] are not an RFC assessment." SSR 96-8p. To prepare a mental RFC, the ALJ cannot simply incorporate his step two analysis; instead he must provide "a more detailed assessment" of functional areas such as concentration, persistence, or pace. *See id.* The ALJ's step two finding therefore did not obligate the ALJ to include mental limitations in the RFC.

Additionally, the ALJ in this case did provide a "detailed assessment" of Plaintiff's mental functioning during his analysis of Plaintiff's RFC. [R. at 26-27.] The ALJ, for instance, described Dr. Modlik's psychological consultative exam, during which Plaintiff demonstrated fluent speech, good orientation, and average intelligence. [R. at 26.] The ALJ also cited Dr. Modlik's conclusion that Plaintiff did not "appear to have any significant psychiatric or mental health problems that prevent him from work[ing]." [*Id.*]

The ALJ then described Dr. Pisano's report. [R. at 27.] He acknowledged that Dr. Pisano assigned a low GAF score that could have indicated difficulty working,[4] but the ALJ then cited Pisano's conclusion that Plaintiff "has good cognitive skills even in the presence of considerable anxiety and depression." [*Id.*] The ALJ also noted that Dr. Pisano reported that Plaintiff had a "logical" thought process and "normal" reasoning skills, [*id.*], and the ALJ added that Plaintiff had suffered from anxiety and mental problems even when he was working as a broker and customer service representative. [*See* R. at 30.] The Court can thus "trace the ALJ's path of reasoning," *Clifford*, 227 F.3d at 874, from the evidence of Plaintiff's mental impairments to the ALJ's conclusion that these impairments would not affect Plaintiff's RFC. The Court acknowledges that some evidence, such as Plaintiff's occasionally low GAF scores, could detract from the strength of the ALJ's conclusion, but the ALJ acknowledged this evidence and

---

[4] The ALJ's decision to give little weight to Plaintiff's low GAF scores is discussed more fully below.

explained why he found it less probative than the evidence on which he did rely. [*See* R. at 26-27.] Because it is not the job of this court to reweigh the evidence, *Overman*, 546 F.3d at 462, the Court will not disturb the ALJ's conclusion that Plaintiff's mental impairments would not affect his RFC.

Finally, the case law Plaintiff cites is not to the contrary. Plaintiff relies on *Baker v. Astrue*, in which this Court stated that "a mild limitation in concentration could conceivably affect [a claimant's] ability to maintain highly skilled employment in a competitive economy." No. 4:10-CV-00066-TWP, 2011 WL 3585613, at *6 (S.D. Ind. Aug. 15, 2011). *Baker* referred to a claimant who had worked as "president of a labor union," a job that was "classified as a highly skilled position." *Id.* (citation omitted). In contrast, Plaintiff in this case previously worked as a customer service representative and associate broker, both of which are generally classified only as "skilled" positions. *See Ellwanger v. Astrue*, 642 F. Supp. 2d 891, 899 (W.D. Wis. 2009) (customer service representative); *Armstrong v. Barnhart*, 434 F. Supp. 2d 543, 546 (N.D. Ill. 2006) (broker). Thus, although *Baker* acknowledges that "mild" mental impairments could affect the ability to perform "highly skilled" work, *Baker* does *not* establish that Plaintiff's "mild" limitations would have impacted his ability to perform his past "skilled" work.[5] Indeed, *Baker* expressly acknowledged that "a mild limitation will not ordinarily be preclusive of one's ability to work," *Baker*, 2011 WL 3585613, at *6, supporting the ALJ's conclusion in this case that Plaintiff could work regardless of any mild limitations assessed at step two. The Court thus finds that substantial evidence supports the ALJ's step four decision.

---

[5] Plaintiff notes that the ALJ in this case did not make a finding regarding how the customer service and broker positions are "generally" performed. [Dkt. 23 at 5 n.1.] Instead, the ALJ considered Plaintiff's occupations as "he actually performed them" [R. at 32.] However, nothing suggests that Plaintiff's jobs as actually performed were "highly skilled." Indeed, Plaintiff himself referred to his past-relevant work as "semi-skilled," [Dkt. 23 at 2], and described one of his duties as "typing updates to client records," [R. at 261], which would also render his employment as actually performed "semi-skilled." *See, e.g.*, *McGuire v. Colvin*, No. 12 C 1413, 2013 WL 4782156, at *6 (N.D. Ill. Sept. 4, 2013) (noting "data entry" is "semi-skilled").

## B. The ALJ's Mental Health Analysis

Plaintiff's next argument is that the ALJ "did not understand treatment for mental health" and hence erred in discounting those portions of the record that indicated Plaintiff's mental conditions had a more severe impact than the ALJ determined. [Dkt. 23 at 7.]

During his discussion of Plaintiff's mental impairments, the ALJ acknowledged that Plaintiff received low GAF scores on several occasions: he cited Dr. Pisano's score of 33, [R. at 27], and both of the VAMC's GAF scores of 40. [R. at 28-29.] The ALJ gave these scores little weight. He noted that in general, a GAF score is only an indication of functioning on "the day of assessment and provides no longitudinal application." [R. at 27 n.1.] In discussing Dr. Pisano's score, the ALJ noted that "outside factors including financial strain" and "family conflict" reduced that day's score, such that it "did not properly reflect the limitations imposed by [Plaintiff's] mental limitations alone." [R. at 27.] The ALJ similarly noted that the first VAMC score accounted for "all" of Plaintiff's collective "disorders/traits," such that it was not a good indication of Plaintiff's mental impairments. [R. at 28.] Finally, the ALJ observed that the second VAMC score incorporated "situational factors" that artificially reduced Plaintiff's score, entitling it to "little weight." [R. at 29.]

Plaintiff argues that the ALJ improperly considered these "situational factors" and contends, without support, that it is "ordinary and routine for mental health treatments to focus on a patient's current situation and stressors." [Dkt. 23 at 15.] He argues the ALJ "did not understand the nature of routine counseling and therapy," such that "substantial evidence does not support his finding that Palomo did not have 'severe' mental impairment." [*Id.*]

The Court does not agree. At the outset, GAF scores are not determinative of an ALJ's analysis: the scores are a tool to plan treatment; they do not assess functional capacity. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Thus, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Id.* (citation omitted).

Moreover, courts have recognized—just as the ALJ in this case did—that a "GAF score can fluctuate depending on the current circumstances." *Herrera v. Astrue*, No. CV-10-0362-CI, 2012 WL 1840128, at *4 n.1 (E.D. Wash. May 21, 2012). Hence, "the Commissioner has declined explicitly to endorse the GAF scale for use in the Social Security disability programs." *Id.* GAF scores are therefore simply another piece of evidence for the ALJ to consider when evaluating the record as a whole. *See, e.g.*, *Jones v. Astrue*, No. 1:11-CV-00357, 2013 WL 228118, at *10 (N.D. Ind. Jan. 22, 2013) (upholding ALJ who considered "low GAF scores," "lack of inpatient treatment," the "medical evidence overall," and claimant's "daily activities" in rendering a decision).

In this case, the ALJ did not err in evaluating Plaintiff's GAF scores. An ALJ may not "ignore an entire line of evidence that is contrary" to his decision, *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003), but here, the ALJ explicitly acknowledged the low GAF scores. [R. at 27-29.] He then explained that Plaintiff's "situational factors" caused the scores to be artificially low, [R. at 29], leading him to attach little weight to the scores. He further explained that the low GAF scores were not consistent with Plaintiff's reported "activities of daily living," which revealed much more "moderate limitations" than a score of 33 or 40 would imply. [*See id.*] This explanation allows the Court to trace the ALJ's reasoning from the evidence to his conclusion, such that the ALJ's decision should be affirmed.

In addition, any error in determining that Plaintiff's mental impairments were not severe was harmless. At step two in the sequential evaluation process, "an ALJ commits a *technical legal error* . . . when he or she does not label a condition, which meets the requirements of the listings, as being 'severe.'" *Hoy v. Astrue*, No. 08 C 04617, 2009 WL 4679746, at \*6 (N.D. Ill. Dec. 7, 2009) *aff'd*, 390 F. App'x 587 (7th Cir. 2010) (emphasis original). This technical error, however, "is not a reversible legal error when the ALJ [finds] other severe impairments and continue[s] with the Regulations' sequential evaluation of the claim." *Id.* (citation omitted).

In this case, Plaintiff's specific argument is that "substantial evidence does not support [the ALJ's] findings that Palomo did not have a 'severe' impairment." [Dkt. 23 at 15.] The ALJ, however, determined that Plaintiff had other impairments that *were* severe, such that he continued to the next step of the sequential disability evaluation process. [*See* R. at 22-24.] He then extensively considered Plaintiff's mental impairments at the later stages of analysis. [*See* R. at 25-30.] Thus, even if the ALJ technically erred by not labelling Plaintiff's mental impairments severe, this error was not reversible. *See Hoy*, 2009 WL 4679746, at \*6.

## C. The ALJ's Alleged Procedural and Technical Mistakes

Plaintiff contends the ALJ "made several procedural errors," [Dkt. 23 at 9], and suggests the ALJ was reviewing the wrong file when he rendered his decision because he misstated Plaintiff's impairments. [*Id.* at 10.] He also disputes several of the ALJ's factual statements made during the ALJ's RFC analysis. [*Id.* at 11-12.]

### 1. Procedural Errors

Plaintiff first claims that "the ALJ did not admit any exhibits into the record," and asserts that this violates the provisions of the SSA's Hearings, Appeals, and Litigation Manual (HALLEX). [*Id.* at 9.] He notes that HALLEX states that before taking testimony, "the ALJ will

make the proposed exhibits a part of the record," ask the claimant whether he has had a chance to examine them, ask whether there are any objections to admission of the exhibits, and rule on any such objections. HALLEX I-2-6-58(C).

The ALJ and Plaintiff's attorney in this case were initially uncertain whether Plaintiff's record was complete. [R. at 65-69.] They were particularly concerned that a set of Plaintiff's records from the VA had not been submitted. [R. at 65.] The ALJ accordingly held the record open to receive the records, [R. at 111], and these records were in fact submitted. [*See* R. at 35-36 (listing admission of records from Department of Veterans Affairs).] Plaintiff, through his attorney, thus had the opportunity to discuss the exhibits with the ALJ and make any objections to their admission.

Next, the index of the administrative record indicates that Plaintiff's records were admitted as exhibits. [R. at 33-36.] The fact that some of these records were admitted after the hearing is of no consequence, as "an ALJ has broad discretion to admit records into evidence after the close of the hearing." *Dornseif v. Astrue*, No. 11 C 4335, 2012 WL 1441770, at *11 (N.D. Ill. Apr. 26, 2012) *aff'd*, 499 F. App'x 598 (7th Cir. 2013). Indeed, "evidence can be submitted up to the date an ALJ decision is issued." *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir.2010).

The Court acknowledges that this discretion to admit evidence after the hearing arguably conflicts with the above-cited HALLEX provisions, but the Seventh Circuit has yet to decide whether HALLEX regulations have binding effect on the Commissioner. *See Ellsworth v. Colvin*, No. 13-CV-31-JDP, 2014 WL 3907139, at *11 (W.D. Wis. Aug. 11, 2014). The Court accordingly will not disturb the ALJ's decision for any technical defect in his compliance with the guidance in the HALLEX manual.

Plaintiff next argues that the ALJ erred by failing to "obtain Palomo's prior claim file." [Dkt. 23 at 9.] He argues that many of his impairments were "longstanding," such that evidence from his past claim could have been relevant to his current claim. [*Id.* at 9-10.]

The current claim is Plaintiff's third attempt to obtain Social Security benefits. Plaintiff's first two claims were denied at the appeals council level in 2006 and the hearing level in 2009. [R. at 249.] The ALJ and Plaintiff's attorney in this case discussed these denials, and Plaintiff's attorney explained that Plaintiff's second claim did not involve a "hearing on the merits." [R. at 64.] Instead, his case was "dismissed for technical reasons." [*Id.*] Plaintiff's attorney further explained that the relevant medical records from this prior claim were "VA grading sheet[s]." [*See id.*] These sheets appear in the current administrative record, [R. at 709-36], and Plaintiff has not pointed to any other evidence from his prior applications that should have been submitted or that could have influenced the ALJ's decision. [*See* Dkt. 23 at 9-10.] Again, the Court notes that at steps one through four of the sequential evaluation process, "[t]he claimant bears the burden" of proof, *Briscoe ex rel. Taylor*, 425 F.3d at 352, such that Plaintiff's failure to point to any evidence that might have changed the outcome of his current claim undermines his argument.

Next, Plaintiff contends the ALJ erred when he "stated that a vocational expert appeared at the hearing," when in fact "no vocational expert appeared." [Dkt. 23 at 10.]

The ALJ's opinion states that "Leah P. Salyers, an impartial vocational expert, also appeared at the hearing." [R. at 20.] Plaintiff's contention is correct insofar as Ms. Salyers never testified at the hearing, but the hearing transcript does state that "[t]he claimant appeared via video teleconference from Indianapolis, IN, and was represented by Scott Lewis. *Also present were Leah Salyers, vocational expert*, via telephone and Karen Swadley, hearing monitor." [R. at

62 (emphasis added).] Thus, the ALJ's opinion seems to accurately reflect who was present at the hearing, regardless of whether Ms. Salyers actually testified.

Additionally, any error in the ALJ's statement about the vocational expert is harmless. Plaintiff does not argue either that the ALJ erroneously relied on the expert's testimony or that he should have sought testimony that the expert never gave; in fact, he offers no explanation whatsoever as to why the misstatement about the expert may have prejudiced him. [Dkt. 23 at 10.] For this reason, the Court has "great confidence" that reversal and remand to correct any misstatement about the vocational expert would not change the outcome of Plaintiff's application, rendering any error harmless. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (calling remand a "waste of time" when it "is predictable with great confidence that agency will reinstate its decision").

Plaintiff finally argues that the ALJ "did not mention Palomo's first administrative hearing at which Palomo apparently appeared without a representative." [Dkt. 23 at 10.] Plaintiff does not explain how this is an error. His statement refers to the October 3, 2011 hearing, in which Plaintiff appeared before ALJ Manico without counsel. [R. at 54.] At that hearing, the ALJ stated that a "lawyer can be helpful," and agreed to postpone the hearing if Plaintiff wished to retain one. [R. at 54-55.] Plaintiff agreed to the postponement, [R. at 56], and Plaintiff then appeared with counsel before ALJ Manico at the previously described January 11, 2012 hearing. [R. at 60.] Nothing in the record suggests any prejudice to Plaintiff from the ALJ's failure to mention the postponement, and Plaintiff has not identified any prejudice. [*See* Dkt. 23 at 15.] The Court thus finds no basis to remand the ALJ's decision.

## 2. Misstatement of Impairments

Plaintiff contends the ALJ misstated his impairments because the ALJ wrote that Plaintiff suffered from the "[r]esidual effects of broken arm and leg." [Dkt. 23 at 10 (quoting R. at 22).] He claims he never alleged such injuries, such that the ALJ must have been examining the record of some other claimant when he made his decision to deny Plaintiff's benefits. [*See id.*]

Plaintiff is correct that his records no not contain evidence of a broken arm or leg, and he is correct that the ALJ's opinion contains a misstatement about Plaintiff's impairments. [*See* R. at 22; Dkt. 26 at 1.] The ALJ's error, however, was harmless.

The ALJ in this case determined at step two that Plaintiff suffered from "severe" impairments in the form of a broken arm and leg. [R. at 22.] Because Plaintiff had severe impairments, the ALJ continued the sequential evaluation process and proceeded through steps three and four, finally determining that Plaintiff was not disabled because he could perform his past relevant work. [R. at 24-32.]

As noted above, an ALJ commits a "technical" legal error at step two when he mistakenly identifies "severe" impairments as "not severe," but this "is not a reversible legal error when the ALJ [finds] other severe impairments and [continues] with the Regulations' sequential evaluation of the claim." *Hoy*, 2009 WL 4679746, at *6. By the same reasoning, the ALJ's erroneous description of the "severe" impairments in this case is not a reversible error. Just as in *Hoy*, the ALJ here made a mistake in identifying Plaintiff's severe impairments, but he nonetheless continued the sequential evaluation process and considered the entirety of Plaintiff's records. [R. at 24-32.] He therefore did not commit a reversible legal error at step two. *See Hoy*, 2009 WL 4679746, at *7. Furthermore, the ALJ's lengthy discussion of Plaintiff's records during his construction of Plaintiff's RFC belies any notion that the ALJ "was not reviewing the record

for Ricardo Palomo, when he render[ed] his decision." [*See* R. at 24-31.] Plaintiff's argument thus lacks merit, and remand is not required.

### 3. Disputed Statements

Plaintiff contends that the ALJ misrepresented facts during his RFC analysis. [Dkt. 23 at 11.] He first notes that the ALJ mentioned that Plaintiff "can walk for about 50 minutes." [*Id.*] Plaintiff contends that he never said he could walk for this long and never provided any documentation supporting this statement. [*Id.*] The ALJ's RFC, however, limited Plaintiff's "continuous walking . . . to 5 minutes," suggesting that the ALJ never relied on the statement that Plaintiff could walk for 50 minutes. [*See* R. at 24.]

 Plaintiff then notes that the ALJ at one point mentioned that Plaintiff drives his wife to and from work. [Dkt. 23 at 11.] Plaintiff now contends that he does not do so. [*Id.*] The records of Dr. Gange's consultative exam, however, specifically state that Plaintiff "now gets out daily to take [his wife] to work and pick her up when she gets off of work." [R. at 596.] It is the responsibility of the ALJ, not this Court, to resolve factual conflicts, *see, e.g.*, *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004), and so the Court will not disturb the ALJ's decision to rely on medical records specifically stating that Plaintiff does in fact drive his wife to and from work.

Plaintiff next argues that the ALJ improperly cited his "financing a[n] H3 Hummer," and says he does not understand how this relates to his disability. [Dkt. 23 at 15.] The reference to the Hummer appears in the record of Dr. Modlik's consultative exam, during which Dr. Modlik noted that financing the vehicle may have contributed to the financial stressors affecting Plaintiff's mood. [R. at 339.] The ALJ recounted this statement during his more extensive discussion of Dr. Modlik's exam, [R. at 26], and nothing suggests the ALJ relied on or placed any particular weight on this statement. Indeed, the ALJ cited numerous other financial stressors,

such as the later foreclosure on Plaintiff's house, [R. at 29], in explaining his decision to discount Plaintiff's low GAF scores. The reference to the Hummer thus presents no basis for finding that the ALJ's decision is unsupported by substantial evidence.

Finally, the ALJ at one point in his opinion stated that he did not find claimant credible because "claimant reported that he is 'unwilling to work at jobs that have been made available to him, specifically managing at McDonalds and Hardees. When asked why he wouldn't take them, he laughed and said 'are you kidding me.'" [R. at 30.] Plaintiff now contends that he does not remember making this statement and asserts that it was error for the ALJ to negatively assess Plaintiff's credibility on the basis of the statement. [*See* Dkt. 23 at 11-12.] The statement, however, appears verbatim in the records of a 2011 mental exam at the VAMC. [R. at 789.] Again, the ALJ has the responsibility for resolving factual conflicts, such that the Court will not disturb the ALJ's decision to credit a medical record that directly states the proposition for which the ALJ has cited it. Further, evidence that a claimant is able but unwilling to work is a valid reason for an ALJ to discount a claimant's credibility. *See Young v. Astrue*, No. 09-1191, 2010 WL 2572047, at *11 (C.D. Ill. June 23, 2010) (approving ALJ's decision to "discount [claimant's] statements regarding the intensity, persistence and limiting effects of his impairment" when evidence showed claimant was "more unwilling, rather than unable to work"). The ALJ in this case therefore did not err in accounting for Plaintiff's reported statements.

### D. Omission of Documents

Plaintiff finally submits with his brief numerous documents that he believes help establish his claim for DIB. [Dkt. 23 at 13.] He has included 1) a statement from 1992 detailing Plaintiff's 1990 accident; 2) a 2005 record from a psychiatric clinic; and 3) letters from the

Department of Veterans Affairs dated November 2008, June 2010, November 2011, and December 2012.[6] [*Id.* at 13.]

During judicial review of the Commissioner's decision the Court may "at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).

Evidence is "new" if "it was not in existence at the time of the administrative proceedings." *Sears v. Bowen*, 840 F.2d 394, 399 (7th Cir. 1988). In this case, all of Plaintiff's records except the 2012 letter from the Department of Veterans Affairs were in existence at the time of Plaintiff's January 11, 2012 hearing. At the hearing, the ALJ held the record open for submission of additional evidence, [R. at 111], such that Plaintiff could have submitted these records at that time. These records therefore do not qualify as "new" for the purposes of 42 U.S.C. § 405(g).

Evidence is "material" if "there is a reasonable possibility that it would have changed the outcome of the Secretary's determination." *Sears*, 840 F.2d at 400. The only "new" evidence Plaintiff has submitted is the December 2012 letter from the Department of Veterans Affairs. [Dkt. 23-1 at 10.] This letter states that Plaintiff receives veterans' benefits based on the VA's finding that he is "totally and permanently disabled due to [his] service-connected disabilities." [*Id.*] The administrative record, however, already contains numerous VA evaluations indicating that Plaintiff is disabled, [*see, e.g.*, R. at 708, 711, 715], and the ALJ has already considered

---

[6] Plaintiff asserts that he previously submitted these documents to the SSA but that they do not appear in his file. [Dkt. 23 at 13.] As noted earlier, however, the ALJ and Plaintiff's attorney discussed submission of evidence at the hearing, [R. at 65-69], and the ALJ specifically held the record open to receive any evidence that may have been missing from Plaintiff's file. [R. at 111.] Plaintiff and his attorney thus already had the opportunity to correct any omissions of previously submitted evidence.

these reports. [R. at 31.] Further, "[d]eterminations of disability by other agencies do not bind the Social Security Administration" and "the Department of Veterans Affairs requires less proof of disability than the Social Security Administration does." *Allord v. Barnhart*, 455 F.3d 818, 820 (7th Cir. 2006). Because the ALJ already considered several reports from the VA, and because these reports are not binding on the ALJ, the Court finds no "reasonable possibility," *Sears*, 840 F.2d at 400, that an additional VA record reporting the same disability finding would change the ALJ's decision. The new VA letter therefore is not material.

Based on this analysis, Plaintiff has not satisfied the requirements of 42 U.S.C. § 405(g), and his submission of additional documents does not require that the Court remand the ALJ's decision.

**Conclusion**

For the foregoing reasons, the Court finds that substantial evidence supports the ALJ's decision that Ricardo Palomo is not entitled to Disability Insurance Benefits. The Magistrate Judge therefore recommends that the Commissioner's decision be **AFFIRMED**. Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Dated:  12/18/2014

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

RICARDO PALOMO
10240 Wellborne Dr.
Oaklandon, IN 46236-7334

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov